Mr. Justice James
delivered the opinion of the Court:
The appellant was tried at the April term,. 1891, of the Criminal Court, upon an indictment of murder, and was convicted of manslaughter. The case is here on motion for a new trial. '
The first bill of exceptions sets forth that “after the regular panel of twenty-six jurors summoned to attend the court during the month of June had been exhausted, without making up a jury, a venire facias was ordered for summoning forty additional talesmen, drawn and qualified as the law directs, to appear in court next day; that on the next day, Thursday, June 11, said talesmen were called, and after sundry challenges for cause, none of which were excepted to, and after the defendant had exhausted his twenty peremptory challenges, and after the District Attorney had exhausted all of the Government’s peremptory challenges save one, there were in the jury box twelve men, duly selected and qualified according to law, namely,’’ etc. “And thereupon the justice presiding said, that the aforesaid Robert F. Bradbury, one of the said twelve jurors, and one of the regular panel of jurors summoned to serve during the month of June, had asked him, the justice, to excuse him from serving on the jury in this case, and had made to the justice such a statement of the con *274 dition of liis business, and of his family, as would justify the court in excusing him; and the justice then asked if counsel on either side would object to his being excused.- The District Attorney replied that Mr. Bradbury was a good man and good juror, but that under the circumstances the Government would not object to his discharge. The defendant by counsel replied that the defendant concurred in the statement that Mr. Bradbury was a good man and a good juror, and therefore the defendant had not challenged him, and wished to retain him asa juror; that the Government still had one peremptory challenge left, and might, by exercising it, excuse Mr. Bradbury without the consent of either the court or the defendant; that the defendant objected to the discharge of Mr. Bradbury by the court as unlawful and unjust to the defendant; especially, among other reasons, because the defendant, having exhausted his challenges, could not object to the person who might be called as a juror in Mr. Bradbury’s place, being duly qualified according to law, while the Government would be at liberty .so.to do.” The exception further states that “after hearing the argument of counsel for the defendant, the court overruled the said objection of the defendant, and ordered that the said Robert F. Bradbury be excused and discharged from serving as a juror in this case, and assigned in open court the following reasons: ‘Mr. Bradbury is a storekeeper, residing with his family in the country. He has at home only his wife and his little boys, and his family have at night no male protector except himself, and if he be detained upon this jury several days, not only will his business suffer, but his family will be exposed for want of his protection.’ ”
The second bill of exceptions states that “Thomas Binnix, one of the talesmen aforesaid, was called, examined, and accepted by the court as a juror in the place of Robert F. Bradbury, excused.
“And thereupon the justice presiding said that G. W. Jones, another one of the jurors accepted, and one of the regular panel of jurors summoned for the month of June, had asked to be excused from serving in this case for reasons stated to the justice and which, by order of the justice, he, the juror, *275 stated publicly as follows: ‘I am a huckster, dealing in the market place. In the mornings and evenings I receive the produce, and sell in the markets and to retailers. I have no one to assist me except my son, a small boy about ten years old, and who has not capacity, by reason of his age and size, to attend to the business. If detained here on this jury, my business would be suspended and seriously injured.’
“The justice then asked if the parties were willing that said G. W. Jones should be excused, to which the Government, by the District Attorney, and the defendant by counsel replied respectively as they had replied in the case of juror Bradbury, set out in the first bill of exceptions; and the defendant objected to said G. W. Jones being excused and discharged by the court.”
Nevertheless, the court overruled the said objection and ordered that said G. W. Jones be excused and discharged as a juror in this case.
The third bill of exception sets forth that George P. Fugitt, one of the talesmen aforesaid, was called, examined, and accepted by the court as a juror in the place of G. W. Jones, excused. It further shows that ‘' thereupon the United States, by the District Attorney, peremptorily challenged John H. Beall, one of the jurors mentioned in the first bill of exceptions; and Richard Rothwell, Jr., one of the talesmen aforesaid was called, and being examined on his voir dire, was found to be a qualified juror free from exception. But he requested the court to excuse and discharge him upon the ground that his business (which was that of a stone mason with a good many buildings on hand), would be suspended and suffer by his detention as a juror here. Thereupon the justice presiding told the said Richard Rothwell, Jr., to stand aside for the present and directed the clerk to call the next talesman. To which order and direction of the justice the defendant by counsel objected and excepted, and requested the justice to note his exception: To which the justice replied that there did not appear as yet any ground of exception.”
This exception further shows that ‘ ‘thereupon Edward Chase, *276 one of tlie talesmen aforesaid, was called and examined and found to be a qualified juror, free from exception, and he was Ordered by the court to take his seat in the jury box; and the said Richard Rothwell, Jr., was by the court excused and discharged.”
It is contended, on the part of the prisoner, that these three acts of the court in excusing persons who had been summoned, notwithstanding the objection of the prisoner’s counsel, were without any authority of law, and that the prisoner was therefore not lawfully tried. On the part of the Government it is contended that the court was authorized to allow the several excuses by section 874 of the Revised Statutes of this District, which is in the following words:
‘ ‘A person may be excused by the court from serving on a jury when, for any reason, his interests or those of the public will be materially injured by his attendance, or when he is a party to any action or proceeding to be tried or determined by the intervention of a jury at the term for which he may be summoned, or where his own health or the death or sickness of a member of his family requires his absence.”
The contention of the prisoner’s counsel is that this provision is part of a general scheme contained in the same original statute with this section, for the organization of a list of jurors to serve for the' term, and that it refers only to the excusing of jurors on the return of the venire; in other words, that this power must be exercised in determining whether the person summoned shall become one of the twenty-six who are to constitute the petit jury.
Undoubtedly, the power to excuse applies at- that time and to such cases, but the language of the.statute seems to have been intentionally made broad enough to include the same exigencies whenever they may arise at a later date. It authorizes a discharge where, for example, the person’s “ own health or the death or sickness of a member of his family requires his absence.” Either of these conditions might happen or might come to the knowledge of the juror, just before the jury was sworn; and if they constitute lawful grounds for discharge at all, they must be just as operative at one time as at another, *277 and must therefore be considered by the court without reference to the time when they arise. So, too, as to the juror’s “interests.” The statute contains no specification or limitation as to the nature óf the interest concerned, or as to the time when it may become an obstacle to service. On the contrary, it gives the court a wide latitude when it authorizes a discharge in case “for any reason” the interests of the juror will be materially injured by his attendance. It is within the purview of this provision that the continuous confinement of the jury in a capital case may materially injure a particular juror’s interests, while he might serve without injury if allowed to go to his home or about his business upon the daily adjournments of the court. It is no answer to say that this jeopardy of his interests might be foreseen by the juror when he first appears to the venire, and that the statute therefore intends that he should at that time prefer his excuse. In the first place, such an answer is not true. A juror knows nothing about the course of business to be brought before him. It is not his duty to foresee, and he cannot foresee, that a capital case, may be tried during his term of service, and. that he may be continuously locked up for many days. It is just when he is about to be called upon for a service which actually brings with it the injury in question, that the occasion for excuse presents itself for consideration, whether by the juror or the court. In view of the manifest policy of this statute that jury service shall not be made disastrous to the people, it is plain that a material injury is not intended to be ignored because it presents itself after the service has begun. The law intends that this interest shall be considered and acted upon when the jeopardy arrives.
Nor does the language of the statute restrict the court to cases in which the pecuniary or vocational interests of the juror may be materially injured. The safety of his family by night is, in contemplation of this law, quite as much his “interest” as is his business by day, and indeed is comparably more important, whether to him or to the public. It would be an absurd verbal criticism which should leave the *278 family in peril, while business, which decent men carry on only for its sake, is cherished. His honor remarked, in one of these cases of excuse, that both the business of the juror and the unprotected condition of his family, who would be alone in the country, required his absence from court. He was authorized to consider the latter as of itself constituting the ‘1 interest ’ ’ to which the statute referred.
It is a further contention, however, on the part of the prisoner, that, even if this statute does authorize the discharge of a juror from service in a particular case, such a discharge cannot be ordered by the court after the prisoner has exhausted his right of challenge, or, in the language of counsel, after the prisoner, by not having challenged the juror in question, has acceptéd him. In support of. this contention, counsel cited the case of Bales vs. The State of Mississippi, 13 Smeedes & Mar., 400, where a juror had been excused after the list had been furnished to the prisoner. In that case Sharkey, J., used the following language:
“There can be no justification for such an exercise of power. A list of the venire is to be furnished the prisoner two entire days before the trial. This is to give him an opportunity of selecting a jury from the list furnished. A prisoner has not a right to be tried by such a jury as he might select from the body of the country, but he has a right to make his selection from the list furnished him, as far as it is practicable for him to do so by exercising his right of challenge. When he can no longer challenge, he must take them as they stand upon the list. And when a juror is tendered; the prisoner has a right to him if competent. The court cannot set him aside without a cause which goes to ‘ his competency as a juror.’ ”
The legal conception at the bottom of this theory of the right of challenge is, that it is operatively a process of selection by the prisoner of the jury by whom he shall be tried. It is upon this theory that the further conception must rest that the prisoner has a right to the juror thus selected. With due respect, we have to say that, in our opinion, this conception of the prisoner’s challenge, and the *279 deduction from it of the prisoner’s right to a juror, are not maintainable. The first of these, the main proposition, contains, as we think, an inversion of legal ideas. The right of the accused is, that he shall have “ an impartial jury,” and, in order that he may be the more certain to enjoy, this right, the statute has given him a privilege to object peremptorily to a certain number of the persons summoned to furnish a jury to try him. We speak with a distinct intention in calling this a privilege, because the Constitution authorizes the legislature to provide means for the selection of a jury without any intervention on the part of the accused, subject to the single condition that the means provided shall be adequate and proper for the selection of an impartial jury. And it is from this point of view that the nature of the privilege of challenge is to be considered. It may be that the purpose of the accused, in objecting to one juror, is to secure another whom he wants, and that his objection will often secure that result; but it is neither theoretically nor practically correct to say. that the law regards him as doing an affirmative act of selection. His privilege is understood, both as to form and intention, to be completely worked out by negation, and with negation it ends. It is no ground of complaint that he may have lost a juror whom he preferred. The sole question is, whether the jury has been constituted according to law, and the essential ground of complaint is, that his right to be tried according to law has been impaired by an unlawful discharge. The question whether the law has been followed is only obscured by interposing this judicial notion that a prisoner’s right to object is a right to choose, and then building on that conception a conclusion that the departure from the law consists of defeating this alleged right of choice.
It is worth while to observe that our conception of a prisoner’s challenge is not a novelty. In 1829 the Supreme Court of North Carolina said, in State vs. Arthur, 2 Dev., 217, 220: “The purposes of justice, and the end of criminal proceedings are attained when a fair and impartial trial is secured to the accused.
“The right of challenge is given to prisoners, not that a *280 particular individual may be put on the jury, but that a prisoner may have a jury free from all objection.” In the later case of The State vs. Shaw, 3 Ire., 533, (1843) where the same court reversed the j udgment on account of an erroneous discharge of a juror, Judge Gaston — whose rank as a jurist needs no comment — said, referring to that decision: “We distinctly admit that the ground on which the peculiar privileges of challenge are allowed to prisoners in capital cases, is, in the language of the eminent judge whose words are embodied in the argument of the Attorney General, not that the prisoner shall be tried by a j ury of his own choice or selection, but by one against which, after exhausting his peremptory challenges he can offer no just exceptions.”
The underlying principle, then, on which judgment was reversed in the cases to which we have been referred, was, not that the accused had been deprived of a right of selection, but that, by reason of an unauthorized discharge of a juror, he had not been tried by a jury organized according to law. In those cases no statute was shown which authorized a discharge without reference to competency. They only show that an unauthorized discharge is error subject to review, and throw no light on the discharges in this case. We hold that by the peculiar law of this District, such discharges are authorized.
Exception was taken next to the admission of the dying declaration of the deceased, 'which was in the following words:
“I, Emanuel Taben, being, as I solemnly believe, in the presence of death from the effects of a mortal hurt, from which I am now suffering, and having abandoned all hope of recovery, in the face, as I believe, of impending death, do solemnly state that the circumstances under which I received the said mortal injury are as follows;
“The name I got from my mother was Harrison, but my right name is Emanuel. I rent from this old man with whom I had the difficulty with. His name is Heath. His first name I do not know. I started out the back way from my *281 house, the house I rent from him, to get some coal oil. He walked down near the water-closet in my yard and cursed me about going through the back gate. He said, T don’t aim for you to go through that back gate,’ (we both live in the same house, he in the front room, and I live in the back room). He dared me to move. We were both facing each other. He was nearer my room than I was, and I concluded that if there was going to be a disturbance I would not go out the back gate. I aimed to step around him to go out the alley. He grabbed an axe from the ground, which I used to chop wood with, and struck at me and cut me on the left arm. In striking at me he threw himself nearly down. I grabbed him and the axe. We got tussling. We both had hold of the axe. He was about to get me under him. He said, T intend to kill you.’ In the scuffle I got rather the advantage of him and begged him to quit. He said, ‘no, I’ll kill you at the risk of my life.’ We both had hold of the axe, but I had more purchase on it than he had, and I tapped him on the head with the eye of it, and not the blade; parcel of women ran out and said, ‘don’t kill father,’ and gave up and stopped. I started in my room. He had to pass my room to get to his room. In passing he grabbed me and tried to bite me, and in that scuffle somebody got the door of my room open, and shoved me in my room and locked me in. The door was locked on the outside. There was a young man in the room with me by the name of Riley Griffin. The door was unlocked and Griffin went out; but I didn’t go out then. I lost three cents in the yard during the scuffle. I got some more money out of a box and started for the coal oil. I went out the door and was putting the hasp on my door, when he jumped out of his room and stabbed me in the right side of chest with a shoe knife, and then ran through his own room out into the street. I had done nothing to him at that time. I called everybody and told them that he had stabbed me. He didn’t have hold of me. He just ‘ soused ’ it into me and left the knife in me and ran. I pulled it out and gave it to an officer. The blade was about four inches long. I cannot write.”
The contention on the part of the prisoner is, that under *282 the rule concerning such declarations, all that part of the foregoing statement which narrates the occurrences in the yard, and especially the threats of the prisoner, should have been excluded. The rhle referred to makes such declarations competent evidence only as to “ the circumstances of the death, ’ ’ and therefore excludes whatever cannot be regarded as part of those circumstances. • But a mere interruption does not necessarily prevent the separated parts from being parts of one transaction; and we are of opinion that the occurrences in the yard and the final event in the house were connected in such a way as actually to constitute one conflict, notwithstanding the disconnection of a few moments. We think that the antecedent, threats were a part of “ the circumstances ” of the .homicide, and that the whole of the statement was properly admitted.
The next exception was taken to the exclusion of a question asked by the defense on cross-examination of Mary Brown, a witness produced by the Government. This witness had given testimony tending to prove that about two weeks after the homicide, she became a tenant of the rooms which were occupied by the prisoner and deceased, respectively, and that the lock on the door leading into the prisoner’s room, which she found there when she moved in, was not then broken. The prisoner had testified in his own behalf that the deceased bursted this door open, and in doing so broke the lock on it ; that he then entered, then retreated to the hall, then re-entered the room, threatening to “fix” the prisoner, and that thereupon the prisoner picked up a knife and stabbed him. It appears that Mary Brown was called to rebut the prisoner’s statement about the broken lock. Thereupon, upon cross-examination, the witness was asked the following question : ‘1 When you moved into that house two weeeks after Heath vacated it, did you or not observe and notice on the floor of the front room, within a yard of the door leading into the hall, any drops or spots of blood ? ” The question was excluded.
It is to be observed that this question was asked on cross-examination of rebutting testimony, when the defense was not regularly in position to call witnesses in chief. We shall *283 pass by the objection that it did not relate to any matter in Mary Brown’s testimony in chief, and was therefore improper on cross-examination, and consider whether such a fact could be inquired of at all without a prior foundation. That the inquiry was to be of that character appears by the situation. The foundation could not be laid at this time. From this point of view, then, the argument for the question must necessarily be, that those drops of blood were shed there by the deceased, and that that fact showed that he was struck while invading the prisoner’s home. If the object of the question was to show that the deceased must have invaded the prisoner’s home when he was stabbed, inasmuch as he bled there, it was clearly necessary to show first that he did bleed there; in other words, that it was he who bled there. Until this should appear, spots of blood could not have any connection with him, or any application in the case. To admit evidence of their existence without more— and, as we have pointed out, this evidence was to be without more — would involve an assumption that these drops fell from the deceased, and would then have involved an inference, from that unproved fact, of another fact, namely, that the deceased was in the act of pursuing the prisoner into his own home when he was stabbed. There was no ground for such a question, and it was inadmissible.
The next exception was to the refusal of defendant’s prayers 5 and6. The fifth was as follows: “That if the defendant armed himself in his room only for the purpose of defending himself, and if the jury find from the evidence that, after he had thus armed himself, he was assaulted by Tapin, and that from such assault he had reasonable ground to apprehend and did honestly apprehend from such assault danger to his life or great 'bodily harm, and, to protect himself from such apprehended injury, he stabbed Tapin with a knife, with which he had armed himself, you should find him not guilty.”.
This was refused, because the following had already been granted: “If the j ury find from the evidence that the deceased, Emanuel Tapin, at the time of the stabbing made an assault upon the defendant, Heath, and that the said assault was of *284 such a character and was made under such circumstances as that the defendant had reasonable ground to apprehend, and did honestly apprehend, from said assault, danger of the loss ' of his life or the infliction of great bodily harm, and while under such apprehension he stabbed the said Tapin, you should find him not guilty.”
The difference between the instruction granted and the instruction refused is not material, and for that reason alone it was proper to refuse the latter. But it is obvious that such repetition of the same matter is not merely needless, it is mischievous, because it may cause an instruction to play the part of evidence by impressing its hypothesis on the jury as a fact.
The sixth prayer was as follows: “That the law presumes the innocence of a party until the contrary is established by indisputable evidence, and such evidence, adduced to establish his guilt, must be so conclusive as to be utterly inconsistent with any other hypothesis; and this presumption of innocence applies to each and every fact that goes to constitute the crime charged and relied on for conviction, and the law resolves each fact in favor of the accused, when such fact can be reconciled with his innocence.”
Such an instruction would have been objectionable for several reasons. In the first place, it is difficult to assign a meaning to the wrords “ indisputable evidence.” All evidence that is not protected by special rules of law is disputable. Evidence as to identity of person, as to words or acts, or as to time and place is disputable, and is commonly a subject of dispute; and it is the very function of the jury to 'determine where the truth lies in the dispute. The matter is not helped by a suggestion that ‘ ‘ indisputable ’ ’ was not used in that sense, and that these words would be understood by the jury to mean evidence which should appear to them so certain and convincing as not to be shaken by dispute. A jury is not to be left to recast an instruction and to substitute for its words what they suppose it intended to have said.
The next clause, which declares that ‘ ‘ this presumption of innocence applies to each and every fact that goes to consti *285 tute the crime charged and relied on for. conviction,” is undoubtedly correct. The facts which “go to constitute the crime charged and relied on for conviction ” are in a capital case, for example, the fact of killing and the fact of malice; and it is precisely to these that the presumption of innocence applies. But when this instruction declares that the law 1 ‘ resolves each fact in favor of the accused, when such fact can be reconciled with his innocence,” it uses the word “fact” in a new sense, and intends the facts put in evidence to overcome the presumption of innocence. If the jury were told that the law resolves each of these facts in favor of the accused when such fact can be reconciled with his innocence, they would be led, perhaps, to disconnect the links of a chain of facts, and would have a right to understand that the presumption of innocence was to be used in checking and weakening, at every step, the evidence that the presumption was not true. While the law sets up the presumption on one side and requires that it must be overcome by proof on the other, this instruction would assign to the presumption the additional function of breaking up the proof against it. It would thus become an active agent in preventing itself from being overcome. We conceive that the law intends, on the contrary, that the whole of the evidence against the accused, without any interference with its logical connections by applying the test of innocence to “each fact,” shall be considered; and that the presumption of innocence shall be placed in one scale and the proof of guilt in the other, and that it is then that the law resolves the whole facts of the case in favor of the accused, if they can be reconciled with his innocence. We think the instruction refused would have been seriously misleading.
On the other hand, the court did not, after refusing this instruction, omit to deal sufficientiy with the subject. The charge contained the following passage:
‘ ‘Another instruction is the one that is usually granted in all criminal proceedings — that the defendant is presumed to be innocent, and cannot be found guilty of any offence embraced in this indictment, until proved to be guilty beyond *286 a reasonable doubt. The safeguard which the law throws around the defendant who is charged with a criminal offense, is, in the first instance, the presumption of innocence. He goes to trial surrounded by that presumption, and his guilt is to be established by the evidence. A man is not to be convicted of any charge until the evidence justifies the verdict, and in order to justify a verdict of guilty, the jury should be satisfied beyond a reasonable doubt.”
No exception was taken to this substitute for the rejected instruction. We think it covered the same subject sufficiently and correctly. There was therefore no error in refusing the defendant’s prayer.
The next exception is to a certain interruption of the prisoner’s counsel in the course of argument to the jury. It is presented in the following words: “While Mr. Ryon, junior and associate counsel for the defendant, was urging before the j ury that the drops of blood found within the door of defendant’s room, as testified by the witness, Caroline Heath, upon her return from the police station, were physical facts tending to corroborate the testimony of the defendant as to the place where the mortal stab was delivered, the justice presiding interrupted Mr. Ryon, and said to the jury: ‘No proper inference could be drawn from the presence of the drops of blood, as testified by Caroline Heath, because no witness had testified that it was Tapin’s blood, and several witnesses had testified that Heath was bleeding. ’ ’ ’
In considering this exception, it is proper to refer at the same time to the following portion of the charge:
“Now, the court said that no inference could properly be drawn from the presence of that blood on the floor, because no one testified that that was Tapin’s blood, and witnesses have testified that Heath was bleeding and that the blood had dripped over his person, and in the absence of any testimony directly tending to prove that Tapin had bled upon the floor in this room, the court felt justified in saying in response to argument that no proper inference could be drawn from that fact. The court did not, however, gentlemen of *287 the jury, intend to take possession of that fact or of any other fact in the case, for that is all left to you for determination. It was simply in response to the position, taken improperly by the defense, that it was the duty of the Government to bring a witness here to prove, at this time, that there was no blood on the floor or at the time the woman Brown took possession of the room.”
At the argument here we understood the ground of objection to be, that the court had substantially argued the facts with defendant’s counsel. However the interruption may have impressed counsel at the time, we think the court in effect called attention to the fact that there was no evidence tending to show whoge blood had made those spots on the floor; and to the further fact -that an argument that the blood discovered there by Caroline Heath tended “to corroborate the testimony of the defendant as to the place where the mortal stab was delivered,” contained an assumption that it had been proved to be the blood of the deceased. In such a case the court had authority to stop that line of argument, instead of merely pointing out that it was improperly adopted. We do not perceive that the mere form of the language employed produced a materially different effect. It did not constitute error.
The next exception was to the following portion of the charge : ,
‘ ‘The court also tells you before adverting to what constitutes self defense, that whilst you are to view the circumstances of the case from the defendent’s standpoint and ascertain really whether he did strike the blow in self defense or not, yet if the evidence satisfies you that he acted carelessly or negligently when he was in no real danger, and he had no reason to apprehend that he was in danger either of loss of life or of great bodily harm, and the blow was struck under an apprehension, but a negligent and careless apprehension, he would be guilty of manslaughter. So that you have two theories that would reduce the crime to manslaughter : one is the blow struck in the heat of passion when Tapin had been the aggressor, and the passion had not cooled or had time to *288 cool ; the other is if it was struck under an apprehension of danger, but the apprehension of danger was not reasonable but was negligent and careless.”
It was to the effect imputed to carelessness by this instruction that objection was made at the argument. The court referred to want of care on the part of the accused in observing whether his life was really in danger. It is difficult to perceive any question about such a requirement. It is upon the exercise of proper care to see that such danger impends that the right to kill depends, and the duty to exercise it is embodied in the very statement of the right of self defense. To say that the law excuses a man for killing in order to save himself from an atrocious or felonious assault, is to say that he must exercise whatever is, under the circumstances, proper care to see that such an assault is impending. If he neglects that duty he kills unlawfully, and such killing is manslaughter. That is the way in which negligence makes the act a crime. The.rule was so laid down in United States vs King, 34 Fed. Rep., 309 by a judge whose knowledge of criminal law is unquestionable. In charging the jury, Racombe, J., there said: “There must be a bona fide belief by the defendant — with the qualification as to appearances that I have called your attention to — -a bona fide belief by the defendant that an atrocious or felonious assault is in process of commission, which can only be resisted by the death of the felonious assailant, to make the killing excusable homicide ; but if such belief, though bona fide, be negligently adopted by the defendant, it would be manslaughter.”
The next exception was to the following part of the charge:
1 ‘ Though a reasonable doubt is a term that is difficult to define, yet it has its limitations. It is a doubt which reasonable men entertain after hearing all the evidence in a case; not an unreasonable doubt; not a mere capricious doubt; and if the evidence in any case is sufficient to satisfy a jury to an extent which would justify them in acting upon the more important affairs of life, then the jury are satisfied beyond a reasonable doubt. If the evidence fails to satisfy them to *289 that extent and up to that point, then they have a reasonable doubt. That is to say, gentlemen of the jury, applying to the evidence in this case the same measure which you would apply to evidence which would be used to induce you to act in any of the important affairs of life; if you are satisfied beyond a reasonable doubt and to that point, then you are justified in acting upon your conviction of‘guilt.”
The appellant’s objection was directed to the concluding sentence of this instruction. We do not think it proper even to discuss this question; it has been settled by the Supreme Court in Hopt vs. Utah, 120 U. S., 431 (439). In that case the following instruction had been given at' the trial: ‘ ‘ The court further charges you that a reasonable doubt is a doubt based on reason, and which is reasonable in view of all the evidence. And if, after an impartial comparison and consideration of all the evidence, you can candidly say that you are not satisfied of the defendant’s guilt, you have a reasonable doubt; but if, after such impartial comparison and consideration of all the evidence, you can truthfully say that you have an abiding conviction of the defendant’s guilt, such as you would be willing'to act upon in the more weighty and important matters relating to your own affairs, you have no reasonable doubt.”
The Supreme Court, speaking by Mr. Justice Field, said: “ The word ‘ abiding ’ here has the signification of settled and fixed, a conviction which may follow a careful examination and comparison of the whole evidence. It is difficult to conceive what amount of conviction would leave the mind of a juror free from a reasonable doubt, if it be not one which is so settled and fixed as to control his action in the more weighty and important matters relating to his own affairs.” And later, after referring to Commonwealth vs. Costley, 118 Mass., the court added: ‘‘Itwas there also said that an instruction to the jury that they should be satisfied of the defendant’s guilt beyond a reasonable doubt, had often been held sufficient without further explanation. In many cases it may undoubtedly be sufficient. It is simple, and, as a rule, to guide the jury, is as intelligible to them generally as any which could *290 be stated, with respect to the conviction they should have of the defendant’s guilt to justify a verdict against him. But in many instances, especially where the case is at all complicated, some explanation or illustration of the rule may aid in its full and just comprehension. As a matter of fact, it has been the general practice in this country of courts holding criminal trials to give such explanation or illustration. The rule may be, and often is, rendered obscure by attempts at definition, which serve to create doubts instead of removing them. But an illustration like the one given in this case, by reference to the conviction upon which the jurors would act in the weighty and important concerns of life, would be likely to aid them to a right conclusion, when an attempted definition might fall. If the evidence produced be of such a convincing character that they would unhesitatingly be governed by it in such weighty and important matters, they may be said to have no reasonable doubt respecting the guilt or innocence of the accused, notwithstanding the uncertainty that attends all human evidence. The instruction in the case before us is as just a guide to practical men as can well be given.”
Exception was reserved to some other rulings in this case, but we have confined our attention in this opinion to the points on which counsel for the prisoner insisted at the argument here. We have not found any error in the record.

Judgment is therefore afirmed